## BRIGGS v. ROWE.

December, 1868.

Although under a general employment to sell real estate, a broker is entitled to be protected against unfairness or fraud, and the owner cannot avail himself of the broker's services in finding a purchaser, and then, by taking the negotiation into his own hands, and reducing the price, effect a sale to the same purchaser and refuse to pay commissions;— yet, if the broker accept an employment that makes his right to commissions depend on procuring a purchaser on specified terms, he cannot recover if he does not perform that service, unless the employer interfered and prevented performance.[*]

The mere fact that a broker intervened between the parties to a negotiation which was originally commenced, and finally consummated, without his agency, and, by his conversation with third persons, contributed to its consummation, does not entitle him to commissions when a sale at the price fixed as the condition of his employment was not effected, and he was not prevented by his employer from effecting a sale at that price.

James A. Briggs and his partner sued Edward Rowe, in the

[*] See also Barnard v. Monnot, p. 108 of this vol.; Stillman v. Mitchell, 2 *Robt.* 523; Jewell v. Emson, *Id.* 165; Redfield v. Tegg, 38 *N. Y.* 212; Moses v. Bierling 31 *Id.* 462; and see 52 *Barb.* 288; Holley v. Townsend, 2 *Hilt.* 34; S. C., 16 *How. Pr.* 125; Harris v. Burtnett, 2 *Daly,* 189; Smith v. Smith, 1 *Sweeny,* 552; Knapp v. Wallace. 41 *N. Y.* 477; Corning v. Calvert, 2 *Hilt.* 56; Maracella v. Odell, 3 *Daly,* 123; McClave v. Paine, 49 *N. Y.* 561,

Brooklyn city court, to recover a commission of one per cent. upon fourteen thousand dollars, for the sale of a house and lot of the defendant, alleged to have been made by the plaintiffs as his brokers. At the close of the testimony upon both sides upon the trial, the court refused to allow the plaintiffs' counsel to go to the jury upon the question whether the plaintiffs had made out a cause of action, and nonsuited the plaintiffs; to which rulings and decisions exceptions were duly taken.

Plaintiffs appealed.

The facts are fully stated in the opinions.

*A. Spaulding*, for plaintiffs, appellants;—Cited Chilton *v.* Butler, 1 *E. D. Smith*, 150; Glentworth *v.* Luther, 21 *Barb.* 145; Morgan *v.* Mason, 4 *E. D. Smith*, 636; Doty *v.* Miller, 43 *Barb.* 529; Moses *v.* Bierling, 31 *N. Y.* 462.

*Greenville T. Jenks*, for defendant, respondent.

WOODRUFF, J.—The testimony given on the trial tended to prove, that in June, 1857, the defendant employed Sylvester Hondlow, a real estate broker, to sell the house and lot No. 43 Pierrepont-street, in the city of Brooklyn, with coach-house attached, and left with him the keys of the house. Hondlow placed thereon a notice or bill, "For Sale—inquire of S. Hondlow & Co."

In the end of January, or in February, 1858, Mrs. Sarah Ravenhill called upon Hondlow, and inquired if he had any houses to rent, and the subject of buying was mentioned. He directed her to Rowe's. She wished a coach-house attached to the premises. She made some inspection, was attracted by the coach-house privilege, and the next day she called on Hondlow for the keys, and examined the house, or had it examined by her family, and in the evening returned the keys, saying that the house was in bad order, and she did not like it.

She had given up the idea of purchasing that house, but afterward, on or about March 3, her son met upon the ferry-boat, Mr. Augustus Rapelye (with whom and with whose father, Jacob Rapelye, Mrs. Ravenhill had been acquainted for several

years). Mr. Rapelye was aware that Mrs. Ravenhill was look-
ing for a house. A conversation was had between them in re-
gard to the premises, and Rapelye told the son that they were
cheap, or that his father, Jacob Rapelye, said the premises
could be bought low, and gave the son a memorandum of the
street and number.

The same day the son wrote to his mother, sending her that
memorandum, and advising her to call and see the property,
and in the evening, on asking her if she had seen the house,
she said she had.

By reason of the memorandum thus received from her son,
she sent to Hondlow, and procured the keys again, and went
herself and examined the house, and called upon Mr. Jacob
Rapelye, and procured him to examine the house for her, to
estimate the expense necessary to put the house in repair, and
he called on Hondlow and told him he had advised Mrs. Raven-
hill to offer him twelve thousand five hundred dollars. The
idea of purchasing the premises being thus revived in the
mind of Mrs Ravenhill, and her son requesting her to ask
Hondlow to call at her house, she send him a message of that
import, and Hondlow accordingly called upon her and her son,
at their residence, and the interview resulted in an offer of
twelve thousand five hundred dollars for the premises.

The next day defendant called at Hondlow's office, "and in-
quired about matters," and the offer was communicated to
him ; he inquired who it was that had made the offer, and was
told it was Ravenhill. He said, "Send him to me:" and ac-
cordingly on the following Sunday Hondlow spoke to Raven-
hill (the son) about it, and he said he would call at his (the
defendant's) store for some goods, and perhaps he (the defend-
ant, will mention it, and that he thought he could make the
arrangement better than through Hondlow. Young Raven-
hill called upon the defendant, and purchased goods—the de-
fendant brought up the subject of the sale and purchase of the
house. Negotiation (without further interference of Hondlow)
was continued at the residence of Mrs. Ravenhill, by defend-
ant, in person, and she purchased the premises at fourteen
thousand dollars, and in due course received a deed and took

possession,—the purchaser, Mrs. Ravenhill, having never seen or had any communication with the plaintiffs.

Obviously, in this narration, no instrumentality of the plaintiffs in the matter of the sale appears, and the purchaser was not aware that they had any agency in the matter. As between her and the defendant (the vendor), so far as there was any intermediate action, it was by Hondlow, the broker, who first called her attention to the house, on which was his bill advertising it for sale, her son, who was assisting. in the pursuit and negotiation, young Rapelye, whose conversation prompted a renewal of the treaty, and Rapelye, senior, who examined the premises for her, and advised an offer of twelve thousand five hundred dollars.

The agency of the plaintiffs (who, also, were real estate brokers), upon which their claim proceeds, was as follows:

In the fall of 1857, one of the plaintiffs called upon the defendant (having learned from one . Mellen, that he had the house for sale), to ascertain the price, the size of the lot, &c. The defendant told him that the house was for sale, and that if he (the plaintiff) sold it, or found a purchaser, he would pay his commissions.

A proposition for an exchange appears to have been procured by the plaintiff in the fall or winter, but· resulted in no agreement.

After the interview between young Ravenhill and Mr. Augustus Rapelye, above mentioned, in which the latter had had the conversation, and handed to the former the memorandum, which he sent to his mother, as above narrated, Mr. Rapelye went to the office of the plaintiffs, and the plaintiff Briggs, having learned from Rapelye, that Ravenhill wanted to buy a house, went to the defendant's store, and defendant stated the price to be sixteen thousand dollars, of which ninety-five hundred dollars might remain on bond and mortgage. Briggs mentioned to the defendant the name of the party for whom he wanted the particulars, and the defendant stated that he knew Mr. Ravenhill.

The plaintiff then left at Rapelye's office a card containing the price, which he afterward gave to young Ravenhill; and some days afterward the plaintiff Briggs called with Rapelye

on young Ravenhill, and was introduced to him, and conversed with him on the subject of the house and the probable cost to put it in repair; and, at a subsequent meeting with young Ravenhill, on the ferry-boat, a like conversation was had.

Upon these facts, what was the procuring cause of the sale? and to whose agency was it due?

This question the plaintiffs are entitled to have answered, on a motion for a nonsuit, as favorably to their claim as the testimony will warrant.

I think it should be assumed, that, for all the purposes of this case, any intercourse with Mr. Ravenhill, the son, may be taken in favor of the plaintiffs, as if it had been with the mother, the purchaser herself, however ignorant she was of any agency of theirs in the matter; and that her son may be deemed, for that purpose, her agent.

In my judgment the plaintiffs failed entirely to show either that they negotiated a sale, or procured a purchaser.

If the sale in fact made, is not to be referred directly to the agency of Hondlow, because he first directed Mrs. Ravenhill's attention to the premises, then obviously it was the conversation of Mr. Augustus Rapelye with Mrs. Ravenhill, and the memorandum then handed to him, which set on foot the negotiation, not with the plaintiffs, but with Hondlow, which produced from Mrs. Ravenhill an offer to buy, a reference of Mr. Ravenhill to the defendant for the continuance of the negotiation, and an ultimate sale by the defendant to the purchaser, Mrs. Ravenhill.

Hondlow first called the attention of Mrs. Ravenhill to the property. He was, and was known to her and her son as, the agent for the sale. The negotiation had ceased and she had given up the idea of buying it, but the recommendation of Mr. Rapelye, or his father, whom she knew, induced her son to advise its renewal, and upon that, induced by that, she renewed the negotiations for the purchase.

The claim of the plaintiffs seems to be that they can appropriate this act and conversation of Rapelye, and by some kind of adoption make it their own.

But Rapelye was not acting for them. He was performing

an act of friendship toward his acquaintance, Mr. Ravenhill, whom he casually met. Rapelye was not employed by the plaintiffs, nor by the defendant. He, by his recommendation of the purchase, stimulated Mr. Ravenhill to urge his mother to renew her negotiations with Hondlow, and she did so. Mr. Rapelye's conversation may have incidentally operated to the advantage of Hondlow, but it conferred no rights upon the plaintiffs.

It does not appear to have been intended, and it certainly did not operate, to lead either the purchaser or her son to treat with the plaintiffs for the purchase; and the interviews which the plaintiffs had with Mr. Ravenhill, appear to have elicited no offer. When, at such interview, Mr. Ravenhill was told that Briggs was agent to sell, he informed him that he had referred the matter to his mother.

In short, the sale was due to the original employment of Hondlow, the examination of the property by Mrs. Ravenhill, assisted by Mr. Rapelye, senior, stimulated by her son, who was moved thereto by his conversation with Mr. Rapelye, junior, and his memorandum of the street and number, already long since known to Mrs. Rapelye herself.

It is, I think, clear that every step in the negotiation would have begun, progressed and reached the final consummation if the plaintiffs had not attempted to intervene. No one thing done therein by the purchaser can be traced to the plaintiffs.

The circumstance, that, after the conversation with Mr. Rapelye, which immediately and directly procured a renewal of the negotiation with Hondlow, the plaintiff Briggs conceived the idea of taking up the negotiation with Mr. Ravenhill, and, with that view, mentioned his name to the defendant as an expected purchaser, is wholly unimportant. He was not then in negotiation with Ravenhill; on the contrary, the information received by the latter from Mr. Rapelye, was then at work, produced a renewal of the negotiations with Hondlow, which, after he had referred Ravenhill to the defendant, resulted in a sale.

These views are in no conflict with Chilton v. Butler, 1 E. D. Smith, 150 ; Moses v. Bierling 31 N. Y. 462, nor with the

cases there cited. Indeed, if we were to adopt the doctrine of one of those cases (Jacobs *v.* Kolff, 2 *Hilt.* 133), that where a specified price is fixed by an owner, and a broker is promised a commission for selling at that price, and fails, he is not entitled to his commission, although, through another broker, the owner sells at a less price,—the plaintiffs' claim could have no possible legal foundation. Without discussing the question as it rose upon the particular circumstances of that case, I think it clear that the broker is entitled to be protected, as stated in Chilton *v.* Butler, against any unfairness or fraud, and that the owner, when there is a general employment to sell, cannot avail himself of the services of the broker in finding a purchaser, and then, by taking the negotiation into his own hands, and reducing his price, effect a sale, and refuse payment of commissions. And, on the other hand, if the broker sees fit to accept an employment, the just and fair import of which makes his title to commissions depend upon his securing a purchaser on terms that are specified, he must perform the undertaking, just as any party must perform his contract in order to claim his commissions; even then, however, the employer may not interfere and prevent such performance.

But, without pursuing these legal questions into their various possible qualifications, it must suffice to say that the nonsuit was properly ordered upon the grounds above stated; and the judgment should be affirmed.

MILLER, J.—This action was brought by the plaintiffs to recover a commission of one per cent. upon fourteen thousand dollars, for a sale of a house and lot of the defendant, alleged to have been made by the plaintiffs as his brokers.

At the close of the testimony upon both sides upon the trial, the court refused to allow the plaintiff's counsel to go to the jury upon the question whether the plaintiff had made out a cause of action; and nonsuited the plaintiff, to which rulings and decisions exceptions were duly taken.

The first question, and the main question which we are called upon to determine is, whether there was any

evidence in the case for the consideration of the jury, which tended to establish that the sale of the house alleged in the complaint was effected or procured by the plaintiffs, such as would authorize a verdict in their favor.

To determine this question, it becomes important to examine the testimony in the case, and consider whether it will bear a construction which would authorize the conclusion that the plaintiffs had procured the sale. The evidence of Briggs, one of the plaintiffs, is relied upon mainly to sustain the theory that the plaintiffs made the sale; and even although it may be contradicted, yet, if it tends to establish that such was the fact, it would clearly have been proper to submit the case to the jury.

According to Briggs' version of the transaction, in March, 1858, a friend of the plaintiffs proposed to one Ravenhill to buy the house, and Briggs called upon the defendant at his store, and took down the price, which was sixteen thousand dollars, and the terms. He mentioned the name of the party to the defendants, who said he knew him very well; that he was selling goods to him, and the payments could be varied from what he had taken down. Briggs was subsequently introduced to Ravenhill, and conversed about the property, and the price it would cost to put it in repair; and it appears, that the card or memorandum which contained the terms was delivered to Ravenhill. He also testifies that he never offered the house at any other price than sixteen thousand dollars to Ravenhill, which he declined, and never sold it to any one at that price. It also appears from Briggs' evidence as well as the defendant's, that some time previously, and in the latter part of 1857, Briggs called at the defendant's office to ascertain whether the property was for sale, and the terms; and the defendant told him if he, Briggs, found a purchaser, the defendant would pay his commissions. The evidence also shows, that one of the plaintiffs named the defendant to Ravenhill as the owner of the property; that the memorandum of the terms of sale was sent by Ravenhill to his mother, and he wrote to her to call and examine the property, which she did, by reason of the memorandum, on the same day; that the defendant re-

quested Briggs to send Ravenhill to him, which was not done, nor any offer brought to him from Ravenhill. According to the testimony of Ravenhill, Briggs gave him no further information besides the memorandum, except that the price was sixteen thousand dollars; and he, Ravenhill, told the defendant, upon inquiry afterward, that the reason he had not bought the property was because the price was too high.

These are the leading facts relied upon by the plaintiffs to establish their right to recover. But it also appears that some time in the month of May or June, 1857, the house had been placed in the hands of one Hondlow, a broker, to be sold, the keys left with him, and his bill put upon it; that, in the month of January or February, following, he had an interview with Ravenhill as to the purchase, and shortly afterward, Ravenhill offered him twelve thousand five hundred dollars for the property, that after the negotiation between Briggs and Ravenhill had failed, Ravenhill went to the store of the defendant, and there a negotiation was opened between them which resulted in a purchase of the property by Ravenhill for fourteen thousand dollars. According to the evidence of Ravenhill, he called upon Rowe about one week after he had failed to agree with Briggs. According to the testimony of Rowe, it was about six weeks after the prior negotiations had fallen through. Whether the first or the latter period, is not material, perhaps, provided no agreement for a sale was made by reason of the acts of the plaintiffs, or by means of their instrumentality.

The most which the plaintiffs seem to have done in negotiating the sale, was to offer the property to Ravenhill for sixteen thousand dollars, and to give the name of Ravenhill to Rowe. Hondlow, who had been employed to sell the house, and had charge of it, was already acquainted with Ravenhill's name, and so far as this fact is concerned, it was no particular advantage to the defendant to be informed of it. The parties did not get together by reason of the plaintiffs' action; were never introduced, and Briggs had full opportunity to negotiate a sale without any interference of the defendant or any other party. He did not succeed in so doing, and utterly failed to accomplish any such result. It was no fault of the defendant that such was the case. He made no objection, opposed no ob-

stacles, and in no way interfered with the negotiation. He did not take the matter out of the broker's hands and thus render himself liable.

But, after it proved fruitless and unavailing, after it had terminated, and was at an end, it would seem, by means of the accidental fact that Ravenhill had come to his store to purchase a bill of goods, he commenced a negotiation for the sale of the house, which resulted in an agreement which was finally consummated.

The defendant is not made liable, I think, merely because he availed himself of the information which he had obtained, that Ravenhill desired to purchase the house, for it appears that Hondlow first informed Ravenhill, that the house was for sale and had informed the defendant of the offer of Ravenhill. It cannot, I think, be claimed fairly that plaintiffs found the purchaser, nor that they were the procuring cause of the sale, and of bringing the parties together. The negotiation had been entirely ended so far as the plaintiffs had any connection with it, and there must be some period of time when a party is at liberty to make new negotiations for the disposition of property, where it is not entirely clear that the whole matter originated with another person, without rendering himself liable for commissions.

It matters not whether Rowe was bound to pay Hondlow a commission for his services. It is enough in this case, that he was not liable to the plaintiffs, and that there was no sufficient evidence of his liability to submit to the consideration of the jury. If the jury, upon the testimony presented, had arrived at the conclusion that the defendant was liable, I think the court would have been compelled to set aside the verdict as contrary to evidence.

The judge was clearly right in granting the motion for a nonsuit, and refusing to submit the case to the jury; and as there was no error upon the trial, the judgment must be affirmed with costs.

CLERKE, J., expressed the following views.

I think that the plaintiffs in their testimony do not show enough to entitle them to commissions.

Hondlow had a great deal more to do with the sale in question than the plaintiffs had. Mr. Ravenhill, their witness, says his mother (the purchaser) had seen Hondlow about the house, several days before he had seen Rapelye, the plaintiffs' friend, who had spoken to him about it. Before Rapelye had spoken, they knew that Hondlow had charge of the house. No doubt, after Rapelye's mention of the house, they made further inquiries, and made offers, but these offers were not accepted, and the negotiation was abandoned.

About six weeks afterward, Ravenhill was in defendant's store purchasing goods, when the defendant asked why he had not bought the house, and then a new negotiation was commenced, and it was sold for fourteen thousand dollars, without the intervention of either the plaintiffs or Hondlow, the other broker.

I think the judgment appealed from should be affirmed, with costs.

A majority of the judges concurred.

Judgment affirmed, with costs.